**KENT ISLAND JOINT VENTURE,**
**Plaintiff,**

v.

**Leonard E. SMITH, Commissioner of Queen Anne's County, Individually and in his official capacity, et al., Defendants.**

**Civ. No. H-77-1299.**

United States District Court,
D. Maryland.

June 8, 1978.

Stuart D. Halpert, Warren L. Miller, Michael A. Nelson and Stein, Halpert & Miller, Washington, D. C., for plaintiff.

Standish McCleary, III and Randall M. Lutz, Asst. Attys. Gen., Baltimore, Md., for defendant James R. Morris.

Roger D. Redden, Neil J. Dilloff and Piper & Marbury, Baltimore, Md., for all other defendants.

ALEXANDER HARVEY, II, District Judge:

In this case, a land developer asserts that its federal constitutional rights have been violated because certain state and local officials have interfered with its plans for the development of a residential subdivision in Queen Anne's County, Maryland. This then is essentially a land use dispute which this Court has concluded does not belong in federal court at this time. As discussed in detail hereafter, the facts of this case either do not fit within the civil rights statutes and constitutional provisions relied upon by plaintiff or require this Court to abstain because of principles of federalism, which become particularly significant when a federal court is asked to review land use policies or zoning decisions of a local government.

Plaintiff, Kent Island Joint Venture, is a Maryland Partnership formed for the purpose of developing a parcel of land on Kent Island in Queen Anne's County, Maryland, known as Paradise Island Estates. Named as defendants are Queen Anne's County (hereinafter referred to as "the County"), Leonard E. Smith, Julius Grollman and John M. Ashley, Jr. (the elected County Commissioners),[1] Robin Wood (the Planning Administrator for the County and an employee of the County Department of Public Works), John Starnes (the Chief of the Water, Sewer and Solid Waste Division of the County Department of Public Works), Lawrence Morris (the Director of the County Department of Public Works) and James R. Morris (a Maryland state employee, who is the Director of Environmental Health for the County).[2] The defendants are therefore the County itself, three County Commissioners, three officials employed in municipal departments of the County and one State employee. Each of the individual defendants has been sued in both his individual and in his official capacity.

The complaint alleges in effect that the defendants entered into a conspiracy to prevent the development of the real property owned by the plaintiff in Queen Anne's County. By the lengthy recitation of facts set forth in the complaint, plaintiff essentially contends that it has been singled out for special discriminatory treatment de-

---

1. In Maryland, local county affairs are administered either by County Commissioners or by a County Council. County Commissioners are charged with such administrative and legislative authority as is granted to them by the State Legislature, Const. Art. VII, *Annot. Code of Maryland,* § 1. Among other powers, County Commissioners have legislative authority to enact zoning regulations, Art. 66B, *Annot.* *Code of Maryland,* § 4.01, and County Master Water and Sewerage Plans, Art. 43, *Annot. Code of Maryland,* § 387C (Cum.Supp.1977).

2. Plaintiff also included the State of Maryland as a named defendant, but on September 27, 1977, plaintiff voluntarily dismissed the State from these proceedings, pursuant to Rule 41, F.R.Civ.P.

signed to prevent its proposed development to be known as Paradise Island. Count I of the complaint asserts that defendants' acts violated the due process and equal protection clauses of the Fourteenth Amendment and also Article 23 of the Maryland Declaration of Rights. Count II alleges violations of the Fifth and Fourteenth Amendments and also Article 23 of the Maryland Declaration of Rights. In Count III, plaintiff claims that it is entitled to relief under 42 U.S.C. §§ 1983 and 1985(3). Jurisdiction is asserted under 28 U.S.C. §§ 1331 and 1343. Plaintiff seeks a preliminary and permanent injunction, a declaratory judgment, compensatory and punitive damages, attorneys' fees and costs.

Presently before the Court are motions to dismiss filed by all of the eight defendants. The questions raised by the pending motions have been fully briefed, and a hearing on the motions has been held in open court. At the request of the Court, supplemental memoranda were filed by the parties following the hearing.

## I

### The facts

The complaint and the exhibits attached thereto detail the efforts undertaken by the plaintiff to build a large real estate development on 300 acres of land it owns on Kent Island in Queen Anne's County. Plaintiff asserts that the individual defendants concocted a four-step plan to delay development of the land and eventually make such development impossible.

The first step in the alleged conspiracy was a subdivision moratorium enacted by the County Commissioners on October 30, 1973, which put a fourteen-month halt to the filing of preliminary subdivision plans.[3]

The filing of such plans is a necessary precondition to the development of subdivisions in Queen Anne's County. *See generally Planning Commission v. Silkor Corp.,* 246 Md. 516, 522, 229 A.2d 135 (1967); Art. 66B, *Annot. Code of Maryland,* § 5.01 *et seq.*

The second step in the alleged plan occurred after the expiration of the moratorium and while plaintiff was preparing a preliminary subdivision plan. It consisted of the imposition by defendant James Morris of strict soil percolation standards for plaintiff's property, which plaintiff claims exceeded the requirements of state law. The standards imposed caused a reduction in the number of lots that were approved for construction. Of the 212 lots which plaintiff contends met the standards, defendant Morris approved only 91 and found that 24 lots would require retesting the following year.

The third step was a series of alleged misrepresentations by defendants Woods, Starnes and James Morris. According to the complaint, defendant Woods lied about the practices of the County Planning Commission and defendants Starnes and James Morris lied as to the effect on plaintiff of certain proposed amendments to the County Master Water and Sewerage Plan (hereinafter referred to as the "Amended Plan").[4] Plaintiff asserts that these misrepresentations were intended to and did in fact delay plaintiff's filing of a preliminary subdivision plan until after the enactment of the Amended Plan.

The final step was the enactment of the Amended Plan by the County Commissioners on March 22, 1977. The Amended Plan significantly changed the water and sewerage requirements for development of plain-

---

**3.** The moratorium was initially enacted for a period of six months and was extended an additional eight months by vote of the County Commissioners on April 9, 1974.

**4.** County Master Water and Sewerage Plans, and all amendments thereto, are controlled by Art. 43, *Annot. Code of Maryland,* § 387C (Cum.Supp.1977). Under the statutory scheme, the governing body of each county

must adopt a ten-year, comprehensive plan for the systematic development of water and sewerage facilities throughout the county. As explained in some detail in *Smoke Rise, Inc. v. Washington Suburban, San. Com'n.,* 400 F.Supp. 1369, 1378–81 (D.Md.1975), the statute is a complex land use planning device intended as a "tool whereby design and rationality can replace * * * chaotic sprawl."

tiff's property. Under the old plan, it was permissible to use individual wells and septic tanks to meet the water and sewerage needs of any homes built on Paradise Island. Under the Amended Plan, plaintiff's property was reclassified to prohibit the use of wells and septic tanks and to require community and multi-use water and sewerage facilities.[5] According to the complaint, defendants Starnes and Lawrence Morris were responsible for including these changes in the proposed amendments to the County Master Plan which were later adopted by the County Commissioners.

Plaintiff contends that these acts, by themselves and taken together, were arbitrary, capricious, discriminatory and devoid of any rational basis or reasonable relationship to the protection of the health, safety and welfare of the citizens of the County. Additionally, plaintiff contends that these actions together amount to a taking of its property without just compensation.

## II

### The claims against the County Commissioners

■ Inter alia, the plaintiff is here challenging two clearly legislative acts of the County Commissioners; first, the enactment of the subdivision moratorium, and second, the enactment of the Amended Plan. Plaintiff contends that both of these acts were arbitrary, capricious, discriminatory and devoid of any rational basis or reasonable relationship to the protection of the health, safety or welfare of the citizens of the County.

In Ligon v. State of Maryland, 448 F.Supp. 935 (D.Md.1977), Judge Blair of this Court carefully examined the scope of immunity enjoyed by local legislators in suits brought against them under 42 U.S.C.

§ 1983 challenging their legislative acts. Relying principally on Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), Judge Blair held that members of the County Council of Montgomery County, Maryland were absolutely immune from damage suits under § 1983 challenging the enactment of zoning regulations.[6] The Court reasoned as follows (at 947):

[b]ecause municipal legislators are closer to their constituents than either their state or federal counterparts, they are, perhaps, the most vulnerable to and least able to defend lawsuits caused by the passage of legislation. Particularly in the area of land use, where decisions may have an immediate, quantifiable impact on both the value and development of property, local legislators should be free to act solely for the public good without the specter of personal liability with the passage of each zoning ordinance.

\*     \*     \*     \*     \*     \*

Collateral litigation of the Council's motives, such as the [plaintiff's] attempt here, would subordinate the role of the legislative branch in contravention of our scheme of government.

This Court would agree completely with the decision in Ligon and with those other cases which have held that county and municipal legislators are absolutely immune from federal scrutiny into their legislative motivations and from personal liability predicated upon their legislative acts. See Gillibeau v. City of Richmond, 417 F.2d 426, 430 (9th Cir. 1969); Athanson v. Grasso, 411 F.Supp. 1153, 1160 (D.Conn.1976); Shellburne, Inc. v. New Castle County, 293 F.Supp. 237 (D.Del.1968). Legislators are

---

5. Under the Amended Plan, plaintiff's property received a so-called W–3/S–3 classification. Property with such a designation may be developed after the County constructs community and multi-use water and sewerage systems. The Amended Plan calls for such construction within two years of enactment. Plaintiff contends that the County has no intention of meeting this two-year deadline.

6. Also see District Land Corp. v. County Council, Civil No. B–75–899 (D.Md. November 23, 1977), a similar case decided by Judge Blair on the same day as Ligon, which reached the same result using identical language.

immune from suits challenging their legislative acts "not for their private indulgence but for the public good." *Tenney v. Brandhove*, 341 U.S. at 377, 71 S.Ct. at 788. Absolute immunity for legislators has been recognized because "the prospect of an unsuccessful but burdensome lawsuit might affect a legislator's performance of his or her legislative duties, thus distorting the democratic process." *Davis v. Passman*, 544 F.2d 865, 879 (5th Cir. 1977). Because local legislators are more vulnerable to law suits than are state or national legislators, the democratic processes of local government are more susceptible of distortion as a result of federal court intervention, and therefore the need for absolute immunity is even more compelling when a County Commissioner is involved.

For these reasons, the claims for damages asserted against defendants Smith, Grollman and Ashley will be dismissed.

## III

### *The § 1985(3) claims*

■ Central to the legal theories espoused by plaintiff in this case are its allegations of a conspiracy among all the individual defendants to prevent development of the land in question. Plaintiff contends that each of the four steps described above was taken with the consent and knowledge of all of the individual defendants and that each was an act in furtherance of the conspiracy. Under this theory, each defendant, or conspirator, shares equal liability for the individual acts of each of the other defendants.

Plaintiff argues first that liability is imposed on all defendants under 42 U.S.C. § 1985(3), which makes actionable conspiracies to deprive "any person" of the equal protection of the laws. However, to state a valid claim under § 1985(3), a plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). *Accord Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 505–06 (4th Cir. 1974); *Hughes v. Ranger Fuel Co.*, 467 F.2d 6, 9–10 (4th Cir. 1972).

In relying upon § 1985(3), plaintiff has seized upon the word "conspire" without considering the context in which the word was used in the statute. Plaintiff has not alleged the existence of any discernible class of which it is a member—a class "possessed of discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." *Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025, 1028 (E.D.Va.1973), *aff'd*, 508 F.2d 504 (4th Cir. 1974). Absent such an allegation, § 1985(3) can afford no remedy here. *See, e. g., Hughes v. Ranger Fuel Co., supra* at 10; *Byrd v. Local 24, I.B.E.W.*, 375 F.Supp. 545, 551–52 (D.Md.1974). Accordingly, plaintiff's claims asserted under § 1985(3) will be dismissed.

## IV

### *The conspiracy claims under § 1983*

■ Alternatively, plaintiff contends that liability of state officials for injury resulting from a conspiracy may be imposed in actions brought under 42 U.S.C. § 1983. This Court is satisfied that such is not the law.

Plaintiff relies on two cases in which actions were brought under § 1983 against groups of defendants, some of whom were private individuals and some of whom were state officials, *Taylor v. Gibson*, 529 F.2d 709 (5th Cir. 1976); *Birnbaum v. Trussell*, 371 F.2d 672 (2d Cir. 1966). In both cases, the issue was whether state action was involved so as to permit maintenance of the suit under § 1983. In both cases, it was held that a private person may be sued under § 1983 when acting in conspiracy or collusion with state officials. Under these holdings, the acts of a private individual may be deemed to have been done under color of state law because of alleged collusion with state officials.

Analysis of these two decisions indicates that their borrowing of traditional concepts of conspiracy law was a limited one, undertaken solely to satisfy the § 1983 require-

ment that state action be involved. In neither case, nor any other case known to this Court, has it been held or even suggested that a defendant would be liable under § 1983 for the individual acts of an alleged co-conspirator. Any such a ruling would be contrary to the great weight of authority rejecting other forms of vicarious liability, such as *respondeat superior,* in actions brought under § 1983. *See, e. g., Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Owens v. Oakes,* 568 F.2d 355 (4th Cir. 1978); *Bolden v. Mandel,* 385 F.Supp. 761 (D.Md.1974).

For these reasons, this Court concludes that each defendant in this case may be held liable, if at all, only for those acts that he personally undertook and not for the acts of any co-defendant.

## V

*The claims of an unconstitutional taking*

■ One of the constitutional violations claimed by plaintiff here is the alleged taking of its property without just compensation. Plaintiff argues that its rights under the Fifth and Fourteenth Amendments to the United States Constitution and under Article 23 of the Maryland Declaration of Rights have been violated because the cumulative effect of defendants' actions has "deprived plaintiff of the most reasonable use of its property as a residential subdivision and [has] resulted in a substantial decrease in the value of plaintiff's property * * *." (Complaint, Paragraph 40). This Court is satisfied that the acts alleged do not constitute a "taking" within the constitutional sense which would permit claims to be asserted in this suit against these defendants.

■ Although governmental interference by regulation of the use of private property can constitute a *de facto* or constructive taking, there is no taking in the constitutional sense unless the interference is so substantial as to render the property worthless or useless. *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 963 (1st Cir. 1972); *Smoke Rise, Inc. v.*

*Washington Suburban San. Com'n,* 400 F.Supp. 1369, 1382 (D.Md.1975). It is not enough that the regulation deprives the property owner of the most profitable use of the property, *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958), or that the regulation causes a severe decline in the property's value. *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). In *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), a decline in value from $800,000 to $60,000 was found by the Supreme Court to be insufficient to constitute a taking. Before a court can conclude that there has been an unconstitutional taking of property, the government regulation must deprive the landowner of all reasonable uses of his land. *C. F. Lytle Co. v. Clark,* 491 F.2d 834, 838 (10th Cir. 1974); *see Donahoe Const. Co. v. Maryland National C. P. & P. Com'n,* 567 F.2d 603, 608 n.13 (4th Cir. 1977).

Plaintiff has done no more than allege that the actions of the defendants have deprived it of the "most reasonable" use of its property and have resulted in "substantial decrease" in the property's value. These allegations are clearly insufficient to establish a taking in the constitutional sense. *Goldblatt v. Town of Hempstead, supra* ; *United States v. Central Eureka Mining Co., supra* ; *Steel Hill Development, Inc. v. Town of Sanbornton, supra.*

The effect on plaintiff of the governmental action here is little different from that of any zoning or land use decision made by local authorities. Plaintiff would like to maximize the profits it might expect to make by developing the land in a certain desired manner. Local zoning and land use decisions made by various County officials have restricted the development and have undoubtedly affected adversely the value of the property. But every zoning decision made by a local government official has an effect on the value of the land involved. If a disappointed developer of land could show an unconstitutional taking of his property every time he lost a zoning case, then every zoning decision made by a local government

official could be brought into federal court for review. Certainly, neither the Fifth Amendment nor Article 23 of the Maryland Declaration of Rights contemplated that a federal court should have the final say in every zoning or land use matter.

Accordingly, plaintiff is not entitled to assert claims against these defendants based on an alleged unconstitutional taking in violation of the Fifth and Fourteenth Amendments and Article 23 of the Maryland Declaration of Rights.

## VI

### Other claims—abstention

■ Various other claims asserted against the defendants remain. Plaintiff seeks injunctive and declaratory relief under § 1983 and the Fourteenth Amendment against the County and the other defendants in their official capacities, and has asked this Court to declare invalid portions of the Amended Plan. Damages are sought under § 1983 and under the Fourteenth Amendment from the defendants in their individual capacities.

As to these other claims, this Court has decided to abstain, for the reasons more fully discussed hereunder.[7] Plaintiff should present these claims to the appropriate state courts.

It is well established that abstention by a federal court is the exception and not the rule. The doctrine is not to be employed for the convenience of federal courts but "only in the exceptional circumstances where order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). As recently explained by Justice Brennan in *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 814–17, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the exceptional circumstances calling for ab-

stention fall into three broad categories and are known respectively as *Pullman*-type abstention, *Burford*-type abstention and *Younger*-type abstention. The three abstention doctrines take their names from the three Supreme Court cases in which the principles were first recognized, *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention under *Pullman* is appropriate to avoid deciding a federal constitutional issue where the case may be disposed of by a decision on questions of state law. *Burford*-type abstention is appropriate to avoid needless state-federal friction caused by federal interference with the administration by the state of its own purely local affairs. Abstention under *Younger* is appropriate where, absent bad faith, harassment or a patently invalid state statute, federal jurisdiction has been invoked to restrain a state civil or criminal law enforcement proceeding. *See generally Fathers United v. Circuit Court of Balto.*, 361 F.Supp. 1080 (D.Md.1973).

Analysis of the cases which have considered the issue of abstention indicates that the various abstention doctrines are more distinct in theory than in actual practice. They overlap and mix together to form the basis for abstention in particular cases. C. Wright, *Law of Federal Courts* § 52 at 218 (3d Ed. 1976). This is especially true in cases challenging in federal court state attempts to implement local land use policy.

In *Fralin and Waldron, Inc. v. City of Martinsville, Va.*, 493 F.2d 481 (4th Cir. 1974), the Fourth Circuit affirmed the decision of the District Court which had abstained on both *Pullman* and *Burford* grounds. In that case, a developer of land had claimed that local government officials had acted arbitrarily and unreasonably in

---

7. It is doubtful that plaintiff can assert a claim under § 1983 based on alleged misrepresentations by defendants Woods, Starnes and James Morris. *Cf. Paul v. Davis*, 424 U.S. 693, 713, 96

S.Ct. 1155, 47 L.Ed.2d 405 (1976). However, it is not necessary to decide that question now, in view of this Court's decision to abstain.

refusing to grant zoning approval for the development of a parcel of land. Speaking for the Court, Mr. Justice Tom Clark relied upon both *Pullman*-type and *Burford*-type abstention principles and said the following:

> All of [plaintiff's] claims raise legitimate questions involving municipal zoning ordinances, the correct construction of local land use law as to special use permits, and the delineation of the proper scope and exercise of local administrative discretion. Understandably, the courts of Virginia have extensive familiarity and experience with such matters, and we believe that they should have the initial opportunity to pass upon them. A state adjudication may well avoid the necessity of a decision on the federal constitutional question presented as well as avoid needless friction in federal-state relations over the administration of purely state affairs. 493 F.2d at 482–83.

A similar approach was taken by Chief Judge Northrop of this Court in his very recent decision in *Planned Parenthood of Maryland v. Mayor and Aldermen of the City of Annapolis*, Civil No. N–78–501 (D.Md. April 7, 1978).

The appropriateness of combining the principles of *Pullman* and *Burford* has been recognized in varying degrees by those courts ordering abstention in cases challenging state land use policy. Some courts have expressly predicated a decision to abstain on both grounds. *Planned Parenthood of Maryland v. Mayor and Aldermen of the City of Annapolis, supra* ; *Santa Fe Land Improvement v. City of Chula Vista*, 71 F.R.D. 573 (S.D.Cal.1976); *Rancho Palos Verdes v. City of Laguna Beach*, 390 F.Supp. 1004 (C.D.Cal.1975); *Fralin and Waldron, Inc. v. City of Martinsville, Va.*, 370 F.Supp. 185 (W.D.Va.1973). Other courts have abstained only on *Pullman* grounds while at the same time expressing traditional *Burford* concerns, such as the avoidance of needless state-federal friction. *Sea Ranch Ass'n v. Cal. Coastal Zone Cons. Com'n*, 537 F.2d 1058 (9th Cir. 1976); *Fralin and Waldron, Inc. v. City of Martinsville, Va.*, 493 F.2d 481 (4th Cir. 1974); *Hill v. City of El Paso*, 437 F.2d 352 (5th Cir.

1971); *Webber v. Skoko*, 432 F.Supp. 810 (D.Or.1977); *Dells, Inc. v. Mundt*, 400 F.Supp. 1293 (S.D.N.Y.1975).

The common thread in these decisions is an abiding deference to the state courts in the area of land use policy. Land use regulation by zoning is "distinctly a feature of local government" which is "outside the general supervisory power of federal courts." *Hill v. City of El Paso, supra* at 357. A land use decision "clearly involves matters entirely within the realm of the state and local governments with which they are singularly familiar, and there are few local issues more sensitive." *Planned Parenthood of Maryland v. Mayor and Aldermen of the City of Annapolis, supra.* (Slip opinion at 5). State courts

> are accustomed to reviewing local ordinances and are in a better position than a federal court to delineate the boundaries of local discretion in the area of land use in the first instance. For the court to sit as a board of zoning appeals from actions by a local city council and circumscribe local power * * * would cause needless conflict with the administration by the state courts of concerns with which they have infinitely more expertise and experience.

*Fralin and Waldron, Inc. v. City of Martinsville, Va.*, 370 F.Supp. at 190–91.

The central issue in this case is the reasonableness of the current water and sewerage classification pertaining to plaintiff's property. Although plaintiff has alleged four distinct infringements of its constitutional rights, its primary complaint is that it cannot develop its property as it would like to do. The only impediment to that development is the allegedly unreasonable water and sewerage classifications approved by Queen Anne's County officials.

Plaintiff contends that the County's current classification of its land is unreasonable because it bears no rational relationship to the protection of the health, safety or welfare of County citizens. Plaintiff asserts that under the Amended Plan all the land adjoining plaintiff's property is

classified to permit the use of wells and septic tanks, while only plaintiff's property is required to have central water and sewerage facilities. Plaintiff claims that there is no rational engineering basis to differentiate between its property and the adjoining property which surrounds it on all sides.

These claims are classic assertions cognizable under Maryland land use and zoning law. Under Maryland law, a zoning or land use enactment may not be upheld unless it is a valid exercise of the police power, *Maryland Advertising Company v. Mayor and City Council of Baltimore*, 199 Md. 214, 221, 86 A.2d 169 (1952), and such an enactment may not be arbitrary, unreasonable or discriminatory. *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 73 A.2d 486 (1950). The test of invalidity of a zoning or land use ordinance is therefore whether it is arbitrary, unreasonable and discriminatory and has no substantial relation to public health, safety, morals or general welfare. *Id.* at 354, 73 A.2d at 488. A land use regulation which prevents property from being used for any reasonable purpose or restricts property to uses for which it is not adapted is invalid. *Baltimore City v. Borinsky*, 239 Md. 611, 622, 212 A.2d 508 (1965); *Loyola Federal Sav. and Loan Ass'n v. Buschman*, 227 Md. 243, 249, 176 A.2d 355 (1961). Zoning or land use restrictions may be invalid if they result in the arbitrary and unreasonable devotion of a small area to a use inconsistent with the uses to which the rest of a district is restricted. *Hewitt v. County Com'rs of Baltimore County*, 220 Md. 48, 58, 151 A.2d 144 (1959).

This Court is satisfied that plaintiff must challenge these land use decisions of Queen Anne's County officials in the state courts of Maryland.[8] The dispute here is strictly a local matter as to which federal intervention is both unwise and unwarranted. The reasonableness of zoning and other land use classifications is a question of state law, the resolution of which could avoid or modify related federal constitutional issues. *See, e. g., Fralin and Waldron, Inc. v. City of Martinsville, Va., supra*. Accordingly, *Pullman*-type abstention is appropriate. Equally important is the fact that state land use policy is a sensitive matter subject to comprehensive local regulation. For a federal court to exercise its jurisdiction in areas of important state domestic policy creates an "unseemly conflict between two sovereignties, [and] the unnecessary impairment of state functions * * *." *Martin v. Creasy*, 360 U.S. 219, 224, 79 S.Ct. 1034, 1037, 3 L.Ed.2d 1186 (1959). Accordingly, *Burford*-type abstention is also appropriate here.

This Court would note the significant trend of recent decisions of the Supreme Court evidencing a greater respect for the states as states and recognizing that the power of Congress and federal courts to interfere with state policy choices and "integral government functions" is limited in many areas. *National League of Cities v. Usery*, 426 U.S. 833, 851, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The cases have not yet clearly defined those limits or all the areas in which they operate, but it is quite apparent that the lower federal courts should hesitate to undertake to review local land policy decisions such as those involved here. The principle involved has been loosely described as federalism. Considerations of federalism requiring deference to the state in the

---

**8.** It is not entirely clear whether the appropriate state procedure for such a challenge is an action for a declaratory judgment in a state court or an administrative appeal to the Maryland Department of Health and Mental Hygiene, followed by judicial review. *Compare Smoke Rise, Inc. v. Washington Suburban San. Com'n, supra*; *Montgomery County Council v. One Park North*, 275 Md. 193, 338 A.2d 892 (1975) (declaratory judgment action) *with Poolesville v. County Council*, 24 Md.App. 347, 330 A.2d 711 (1975); *Savage Fogarty Co. v. Gleason*, Equity No. 59958, Circuit Court for Montgomery County, Maryland (November 16, 1977) (administrative appeal). Whichever is the correct procedure under State law, this Court is satisfied that plaintiff has an effective state remedy and should resort to it.

area of state governmental employment, education and law enforcement apply with even more force in the area of state land use policy, an area traditionally considered "distinctly a feature of local government." *Hill v. City of El Paso, supra* at 357. *Cf. Ahrensfeld v. Stephens*, 528 F.2d 193 (7th Cir. 1975). Were this Court to permit every disappointed property owner to come directly into federal court under § 1983 merely by alleging that a local land use decision is unreasonable, arbitrary and discriminatory, the Court would be assuming the functions of a State-wide court of zoning appeals with power to review every local zoning or land use decision in the State of Maryland.

The claim against defendant James Morris must be dealt with separately. Plaintiff has alleged that James Morris imposed on it excessively strict soil percolation standards. Such a claim presents a question of state law involving the application of the facts to regulations promulgated by the Maryland Department of Health and Mental Hygiene. Presented then is a classic *Pullman*-type situation. A federal court should abstain where the application of state law by a state court or administrative agency could avoid or modify the federal constitutional question. *Railroad Commission of Texas v. Pullman Co., supra*, 312 U.S., at 493–500, 61 S.Ct. 643. Accordingly, for this additional reason, abstention is appropriate as to this particular claim against defendant James Morris.

Plaintiff places heavy reliance on *Donahoe Const. Co. v. Maryland National C. P. & P. Com'n*, 398 F.Supp. 21 (D.Md.1975), *rev'd on other grounds*, 567 F.2d 603 (4th Cir. 1977). In that case, Judge Young of this Court declined to abstain in a suit in which an owner of property claimed that land use actions taken by a County resulted in a taking of private property without just compensation. In *Donahoe*, the primary issue was whether certain governmental officials had so abused their condemnation powers that their actions constituted a *de facto* taking of plaintiff's property without just compensation. Unlike the present case, *Donahoe* did not concern the reasonableness of a land use classification made pursuant to a comprehensive regulatory scheme. Accordingly, there was no potentially dispositive question of state law, nor was there the danger of unwarranted federal interference with important county regulatory policies. *Compare Fralin and Waldron, Inc. v. City of Martinsville, Va., supra.* For these reasons, *Donahoe* is not controlling here.

The only question remaining is whether this Court should retain jurisdiction pending state adjudication or should dismiss the action altogether. The usual procedure is to retain jurisdiction in *Pullman* situations and to dismiss in *Burford* situations. *See* C. Wright, *Law of Federal Courts*, § 52 (3d Ed. 1976). In this case, the Court's decision to abstain is based on both *Pullman* and *Burford* grounds.

Under all the circumstances here, this Court concludes that the better approach would be to dismiss the suit at this time. Dismissal will avoid the uncertainty and delay caused by piecemeal adjudication where jurisdiction is retained. *See Baggett v. Bullitt*, 377 U.S. 360, 378–79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). More importantly, *Burford*-type abstention requires that a federal court not merely delay a decision, but completely avoid interfering with state policy. Where *Burford* considerations are present, a federal court should refer all the issues in the case to the state court and not retain jurisdiction. *Sante Fe Improvement v. City of Chula Vista, supra.* Such an approach is particularly appropriate where zoning and land use decisions are under attack in a federal court proceeding.

## VII

### Conclusion

For the reasons stated, the defendants' motions to dismiss will be granted. An appropriate Order will be entered by the Court.